UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IBRAHIM MUMID, FADUMO MUSE, FAHMO AHMED, SAFIYA MOHAMED, IFTU JIBRIL, MAYMUNA MUKTAR OSMAN, MISBAH IBRAHIM, AMAL MOHAMED, SHAMSA ALI MOHAMED, YURUB SIYAD, MUNA MOHAMED, AMINA HARUN, and MOHAMUD A. MOHAMED, | Case No. 0:05-CV-2176 (PJS/JJG) |

                    Plaintiffs,

v.

ABRAHAM LINCOLN HIGH SCHOOL,                         ORDER
THE INSTITUTE FOR NEW AMERICANS,
and SPECIAL SCHOOL DISTRICT NO. 1,

                    Defendants,

SPECIAL SCHOOL DISTRICT NO. 1,

                    Third-Party Plaintiff,

v.

METROPOLITAN FEDERATION OF
ALTERNATIVE SCHOOLS, INC.,

                    Third-Party Defendant.

---

Daniel R. Shulman, GRAY PLANT MOOTY MOOTY & BENNETT, PA; Robert J. Kolstad; R. Travis Snider, SNIDER LAW FIRM, LTD.; David L. Shulman, LAW OFFICE OF DAVID SHULMAN, PLLC, for plaintiffs.

Paula Weseman Theisen and Sarah R. Schmitz, MEAGHER & GEER, P.L.L.P., for defendants Abraham Lincoln High School and Institute for New Americans.

Sonya J. Guggemos, Margaret A. Skelton, and Kimberley K. Sobieck, RATWIK, ROSZAK & MALONEY, P.A., for defendant/third-party plaintiff Special School District No. 1.

Susan M. Tindal and Jon K. Iverson, IVERSON REUVERS, LLC, for third-party defendant Metropolitan Federation of Alternative Schools, Inc.

Plaintiffs are a group of thirteen young men and women who were once students at defendant Abraham Lincoln High School ("Lincoln").  Lincoln, a public alternative high school in Minneapolis, was established to serve foreign-born students with limited English skills and little formal education.  When plaintiffs attended Lincoln, it was run by defendant Institute for New Americans ("the Institute") under an arrangement between third-party defendant Metropolitan Federation of Alternative Schools ("MFAS") and defendant/third-party plaintiff Special School District No. 1 ("District 1"), the entity that runs the Minneapolis public schools.

Plaintiffs contend that they were badly educated and discriminated against at Lincoln in violation of two federal laws and one state law: the Equal Educational Opportunity Act of 1974 ("EEOA"), which requires schools and school districts to make efforts to overcome language barriers faced by students, 20 U.S.C. § 1703(f); Title VI of the Civil Rights Act of 1964, which prohibits recipients of federal funding from discriminating on the basis of, among other things, national origin, 42 U.S.C. § 2000d; and the Minnesota Human Rights Act ("MHRA"), which likewise bars national-origin discrimination, Minn. Stat. § 363A.13.

The Institute and District 1 move for summary judgment, as does MFAS.  For the reasons that follow, the Court grants the Institute's and District 1's motions.  As a result of this ruling, District 1's third-party complaint against MFAS, in which District 1 seeks recovery against

MFAS if District 1 is held liable to plaintiffs, is now moot.  The Court therefore denies MFAS's

motion for summary judgment without addressing its merits.

I.  BACKGROUND

The underlying facts are set forth in the Court's March 13, 2006 order on defendants'

motions to dismiss [Docket No. 36].  *Mumid v. Abraham Lincoln High Sch.*, Civ. No. 05-2176,

2006 WL 640510, 2006 U.S. Dist. LEXIS 9967 (D. Minn. Mar. 13, 2006).[1]  The parties largely

agree on the facts, but to the extent that the parties disagree, the Court recounts the facts in the

light most favorable to plaintiffs.

Lincoln was established in the late 1990s by the Institute, a nonprofit corporation.  Inst.

Mem. Supp. Mot. S.J. ("Inst. SJ Mem.") at 6 [Docket No. 136]; Inst. Ex. 46 at 2 Req. 3 [Docket

No. 119].  Lincoln itself is not a legal entity; rather, it is essentially a trade name of the Institute,

which operates Lincoln.  *See* Inst. SJ Mem. at 6; Giles Aff. ¶ 6 [Docket No. 129].  The Court will

therefore sometimes refer to Lincoln and the Institute collectively as "Lincoln."

The Institute is a member of another nonprofit entity, third-party defendant MFAS.  Inst.

Ex. 46 at 2 Req. 3.  MFAS is an umbrella organization whose members operate public alternative

schools.  MFAS Mem. Supp. Mot. Partial S.J. ("MFAS SJ Mem.") at 3 [Docket No. 112].  From

1997 through 2003, District 1 contracted with the Institute indirectly, through MFAS.  During

that period, District 1 had an arrangement with MFAS whereby MFAS's members (such as the

Institute) would operate alternative schools (such as Lincoln) on behalf of District 1.  Inst.

Exs. 24-25.  Beginning in mid-2003, District 1 contracted directly with the Institute for the

---

[1]The March 13, 2006 order was entered by Judge Ann D. Montgomery, to whom this case
was assigned before being transferred to the undersigned.

education of students at Lincoln.  Inst. Exs. 26-28.[2]  Since mid-2007, when Lincoln became a

public charter school funded by the State of Minnesota, District 1 has not had any authority,

direct or indirect, over Lincoln.  Giles Aff. ¶ 7.

Plaintiffs are thirteen students who attended Lincoln between 1999 and 2006.[3]  Nine

plaintiffs were born in Somalia, and four in Ethiopia.  All thirteen plaintiffs fled their native

countries and lived for some time in Kenyan refugee camps before immigrating to the United

States.  Most plaintiffs were in their mid- to late teens when they immigrated, though one (Muna

Mohamed) was as young as fourteen and another (Maymuna Muktar Osman) was as old as

twenty.  At the time of their enrollment at Lincoln, plaintiffs had varying, but generally low-to-

nonexistent, levels of formal schooling and familiarity with the English language.

In Minnesota, students cannot graduate from high school unless they accumulate enough

credits of course work and pass certain state-mandated tests.  When plaintiffs attended Lincoln,

the required tests were the Basic Skills Tests ("BSTs") in reading, writing, and mathematics.[4]

---

[2]In 2006, Lincoln changed its name to "Lincoln International High School," and for the 2006-2007 school year, District 1 contracted directly with an entity by that name, not with the Institute.  Inst. Ex. 28.  The parties have not, however, argued that this should have any impact on this litigation.

[3]The information in this section about the individual plaintiffs is taken from District 1's opening summary-judgment brief.  Plaintiffs acknowledge that District 1's brief correctly sets forth this information.  Pl. Mem. Opp. Defs. Mots. S.J. ("Pl. SJ Opp.") at 31 n.5 [Docket No. 137].

[4]Minnesota has since replaced the BSTs with tests called the "Graduation-Required Assessments for Diploma" or "GRAD" tests.  Students who started eighth grade in 2005-06 or afterwards must take the GRAD tests rather than the BSTs.  Minn. Dep't of Educ., "BST," http://education.state.mn.us/MDE/Accountability_Programs/Assessment_and_Testing/Assessments/BST/index.html (last visited June 11, 2008).

Two plaintiffs passed the BSTs (Amal Mohamed and Yurub Siyad) after receiving disability-related accommodations from the state; two other plaintiffs (Amina Harun and Mohamud Mohamed) passed the BSTs without receiving any accommodations.  All four of these plaintiffs graduated from Lincoln.  One more plaintiff (Maymuna Muktar Osman) graduated from Lincoln; it is not clear from the parties' briefing whether she passed the BSTs or (as sometimes happens) was exempted from doing so.  The remaining eight plaintiffs did not graduate from Lincoln; seven of these eight failed all portions of the BSTs, while one (Muna Mohamed) passed the mathematics portion of the tests but failed the reading and writing portions.  Several of the plaintiffs were allowed to remain enrolled at Lincoln past their twenty-first birthdays, despite the fact that Lincoln received no public funding for students after they turned twenty-one.  Mpls. Pub. Sch. Mem. Supp. Mot. S.J. ("Dist. 1 SJ Mem.") at 6, 11-25 [Docket No. 128].

Plaintiffs criticize Lincoln for its poor curriculum, its underqualified teachers, its failure to assess students' progress, its placement of students in a program (so-called Level 9B) that provided little educational benefit and effectively guaranteed that the students would not graduate, its failure to assess whether students needed special-education services, and its failure to provide such services when needed.  Pl. Mem. Opp. Defs. Mots. S.J. ("Pl. SJ Opp.)" at 5-18, 21-31 [Docket No. 137].  According to plaintiffs, Lincoln's shortcomings amounted to intentional discrimination against them on the basis of their national origin.  *Id.* at 1 ("The evidence of record in this case establishes that defendants collectively were responsible for the establishment and operation of a substandard high school that essentially warehoused immigrant students until they aged out of the school system without even the rudiments of an adequate

education, solely because they were immigrants.").  Plaintiffs also argue that because of the

school's many flaws, Lincoln failed to provide them an education designed to overcome

language barriers as mandated by the EEOA.  *Id.*

With respect to the curriculum, plaintiffs deny that Lincoln had a coherent curriculum of

any kind.  *Id.* at 6-7.  They further argue that if such a curriculum existed, it was unsound.  *Id.*

at 27-28.  Specifically, plaintiffs allege that Lincoln's instruction was a form of "English

immersion" and that immersion is not an effective approach for students like plaintiffs.  *Id.*  For

its part, Lincoln counters that it did have an appropriate curriculum, which was based on a

"sheltered English" model of instruction.  Inst. Reply Mem. Supp. Mot. S.J. ("Inst. Reply") at 2-5

[Docket No. 145].  But plaintiffs' educational expert, Martha Bigelow, supports their contentions

that Lincoln's curriculum was both insufficiently developed and poorly suited to Lincoln's

student population.  Inst. Ex. 21.[5]

---

[5]Bigelow concluded her report this way:

> I have found much evidence that [Lincoln] failed to overcome
> students' English language learning needs to allow them to
> participate in the educational program offered by the school
> district.  They failed in multiple and intersecting ways as they
> chose program models, assessment tools/procedures and
> instructional approaches that were not well suited to their unique
> student population.  Unprepared and unsupported teachers,
> counselors and aid[e]s were left under the guidance of unprepared
> administrators.  Immigrant students at [Lincoln] deserved much
> more.  Their need for an education was crucial and now they are
> left, again, after already having their education delayed or
> interrupted, to make up for lost time on their own.  It should not
> have been this way for our newest Minnesotans.

Inst. Ex. 21 at 24.

Plaintiffs also present evidence that teachers and the principal at Lincoln were underqualified because they lacked necessary credentials.  Pl. SJ Opp. at 8-9; Inst. Ex. 21 at 16-18.  The Institute counters by alleging that plaintiffs looked for licensing data in the wrong place and therefore erroneously concluded that some state-licensed teachers were unlicensed.  Inst. Reply at 6-8.  Thus there appears to be a dispute of fact over the credentials of Lincoln's teachers and its principal.  For summary-judgment purposes, the Court assumes that at least some of the teachers at Lincoln lacked proper teaching credentials.

Plaintiffs' criticisms about special-education testing and services are borne out, in part, by a report issued in June 2005 by the Minnesota Department of Education ("MDE") after the department investigated a student's complaints about how Lincoln treated students with disabilities.  Shulman Aff. Ex. A [Docket No. 138].[6]  The MDE found that under one percent of Lincoln's student population in 2004-2005 was receiving special-education services.  *Id.* at 4. The MDE further found that students at Lincoln were required to wait at least one year after enrolling in Lincoln before Lincoln or District 1 would evaluate them for special-education services — and that, in general, students were not evaluated until they had received at least three years of "English Language Learners" (or "ELL") instruction (i.e., instruction in the English language for non-native speakers).  *Id.* at 9 ¶ 15.

District 1 and Lincoln do not deny that it was their policy to defer assessing students at Lincoln for special-education services until the students had received three years of ELL instruction.  The MDE report on which plaintiffs rely, however, says that this policy was based on District 1's belief that special-education assessments would not be reliable if they were done

---

[6]Lincoln and District 1 have not challenged this report's admissibility.

any earlier because some part of a student's assessment results might be attributable to English-language deficiencies rather than genuine special-education needs.  *Id.*  The MDE, however, found that District 1 and Lincoln's policy of delaying assessment for three years was impermissible under state and federal regulations.  *Id.* at 11.  The MDE also found that Lincoln and District 1 violated state regulations by not developing adequate remediation plans for students who failed the BSTs.  *Id.*

## II.  ANALYSIS

### A.  *Standard of Review*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006).  In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party."  *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B.  *Title VI and MHRA Claims*

Title VI of the Civil Rights Act of 1964 forbids discrimination by recipients of federal funding.  Specifically, § 2000d of Title 42 of the United States Code provides:  "No person in the United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  The MHRA contains an even broader prohibition on discrimination by educational institutions.[7]  Minn. Stat. § 363A.13. Plaintiffs contend that Lincoln and District 1 violated 42 U.S.C. § 2000d and the MHRA by discriminating against them because they were not born in the United States.

District 1 and Lincoln concede that they are subject both to the MHRA and, because they received federal funding, to § 2000d.  But they argue that plaintiffs have no evidence that either defendant *intentionally* discriminated against plaintiffs.  At most, say defendants, plaintiffs have evidence that District 1's and Lincoln's actions had a *disparate impact* on plaintiffs because of their national origin.  Dist. 1 Reply Mem. Supp. S.J. Mot. at 6 [Docket No. 150]; Inst. SJ Mem. at 45.

---

[7]The MHRA provides in part:

> It is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of race, color, creed, religion, national origin, sex, age, marital status, status with regard to public assistance, sexual orientation, or disability, or to fail to ensure physical and program access for disabled persons.

Minn. Stat. § 363A.13 subd. 1.

The parties agree that plaintiffs' MHRA claims should be analyzed under the same legal standards as plaintiffs' Title VI claims.  Dist. 1 SJ Mem. at 48-49; Pl. SJ Opp. at 63; *see also Brantley ex rel. Brantley v. Indep. Sch. Dist. No. 625*, 936 F. Supp. 649, 657 n.16 (D. Minn. 1996).  Accordingly, the Court will focus primarily on Title VI.

The parties also agree that the MHRA claims of eleven plaintiffs are untimely (those of Ibrahim Mumid, Fadumo Muse, Fahmo Ahmed, Safiya Mohamed, Iftu Jibril, Maymuna Muktar Osman, Misbah Ibrahim, Shamsa Ali Mohamed, Yurub Siyad, Muna Mohamed, and Amina Harun).  *See* Dist. 1 SJ Mem. at 47-48; Tr. Oral Arg. Jan. 3, 2008.  The MHRA claims of those plaintiffs are therefore dismissed for that reason, in addition to being dismissed on the merits.

The Court agrees with District 1 and Lincoln.  The facts, viewed in the light most favorable to plaintiffs, support, at most, a disparate-impact claim.  It is settled law that disparate-impact claims cannot be brought under Title VI; rather, Title VI prohibits only intentional discrimination.  *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).  Thus, to establish a Title VI violation, a plaintiff must prove that a defendant's challenged actions were rooted in discriminatory animus — in a subjective intent to discriminate.

In general, there are two different methods of proving intentional discrimination:  the direct method and the indirect method.  *See Rogers v. City of Chicago*, 320 F.3d 748, 753-54 (7th Cir. 2003); *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 529 (7th Cir. 2003); *Darke v. Lurie Besikof Lapidus & Co.*, 550 F. Supp. 2d 1032, 1040-41 (D. Minn. 2008).  Under the direct method, a plaintiff with strong evidence of a defendant's discriminatory intent, such as discriminatory statements by key decision makers, may rely on that strong evidence to directly establish intentional discrimination.  *See Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004); *Darke*, 550 F. Supp. 2d at 1041 ("[T]he direct method applies when the plaintiff . . . has strong evidence of discrimination.").  The indirect method, available to plaintiffs with weaker evidence of discriminatory intent, is based on the familiar three-step framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *Darke*, 550 F. Supp. 2d at 1041 ("[W]hen the plaintiff's evidence is weaker, *McDonnell Douglas* gives the Court a framework for analyzing whether the evidence is nevertheless sufficient to support a verdict of discrimination.").

To the extent that plaintiffs have any evidence of intentional discrimination by either Lincoln or District 1, that evidence is quite weak.  And, as explained below, that weak evidence

-10-

is insufficient for a jury to find that either defendant intentionally discriminated.  Although a reasonable jury could perhaps find that District 1's and Lincoln's actions produced a disparate impact on plaintiffs because plaintiffs received a substandard education compared to United States-born students, a reasonable jury could not find that either District 1 or Lincoln intentionally discriminated against plaintiffs — that is, provided a poor education to them *because* of their national origin.

The Court therefore grants summary judgment to defendants on plaintiffs' Title VI and MHRA claims.  Because the Court's analysis with respect to Lincoln differs slightly from its analysis with respect to District 1, the Court discusses each defendant separately.

### 1.  Lincoln

Plaintiffs in this case do not have strong evidence of intentional discrimination by Lincoln.  Indeed, the record contains only a single statement by a single teacher at Lincoln that could be interpreted as reflecting animus against plaintiffs based on their national origin:  After some students circulated a petition criticizing a teacher at Lincoln, another teacher wrote, "I am certain that students would never dare try something like this in their home country, and it shouldn't be allowed here."  Shulman Aff. Ex. KK.  This single statement by a single teacher is not nearly enough for a jury to conclude that Lincoln, as an institution, intentionally discriminated against plaintiffs.

Indeed, although plaintiffs contend that there is direct evidence of discrimination, their argument is based almost entirely on evidence of the *impact* of Lincoln's educational system on plaintiffs.  Pl. SJ Opp. at 63-67.  Plaintiffs assert, correctly, that Lincoln was "intentionally created . . . to accommodate students who were not native-born."  *Id.* at 64.  Plaintiffs then appeal

to the "axiomatic" proposition "that persons intend the consequences of their actions." *Id.* at 63.

With that proposition in mind, plaintiffs contend:

> Since [the Institute] established and operated [Lincoln] only for
> immigrant students, but then failed to educate them, [Lincoln] by
> design knew and intended that its unlawful conduct would affect
> only immigrant, foreign-born students, and not American-born,
> non-immigrant students.  It created and maintained a substandard
> facility and program for immigrants, something [the Institute]
> knew would never be permitted for mainstream, non-immigrant
> students.  Because [the Institute] knew it was dealing with a non-
> English speaking immigrant population, the record clearly supports
> an inference that [the Institute] believed it could get away with
> doing less for this group of immigrants than for a non-immigrant
> population.  This is the essence of discrimination.

*Id.* at 64-65.

As this passage makes clear, plaintiffs contend that they were badly educated at Lincoln.
The Court assumes, for summary-judgment purposes, that this is true.  But the substandard
education that plaintiffs received is an *effect* of the educational policies and practices of Lincoln,
and although that effect was felt only by foreign-born students, it does not follow that Lincoln
intentionally discriminated against such students.  Put simply, not every disparate impact reveals
discriminatory intent; if it did, the distinction between disparate-impact claims and intentional-
discrimination claims would evaporate.

In this case, it is theoretically possible that Lincoln deliberately set out to provide a poor
education to foreign-born students as a way of harming them.  There is no evidence of this,
however, and it is at least equally possible that Lincoln educated its students badly as a result of
incompetence, not animus.  Incompetence that happens to burden only members of a protected
class is not, by itself, evidence of discriminatory animus.

Suppose, for example, that a former professional baseball player volunteers to coach a Little League team made up entirely of African-American boys.  And suppose further that the former player — an African-American himself — turns out to be a terrible coach.  The *impact* of the terrible coaching would be felt only by African-Americans.  But that does not mean that the former player provided terrible coaching because of animus toward African-Americans.  He might have had positive feelings toward African-Americans and sincerely wanted to *help* them — indeed, that may have been why he volunteered to coach a team of African-American boys — but simply turned out to be an incompetent coach.  Likewise Lincoln may have had positive feelings toward foreign-born students and sincerely wanted to *help* them, but simply turned out to be a substandard school.

Lacking strong evidence of discriminatory intent on Lincoln's part, plaintiffs could — if this were an ordinary case — rely upon the three-part *McDonnell Douglas* framework to attempt to establish that Lincoln intentionally discriminated against them.  *See McDonnell Douglas*, 411 U.S. at 802-03; *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1055 (8th Cir. 2007); *Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998) (discussing applicability of *McDonnell Douglas* in Title VI cases).  Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination.  If the plaintiff does so, the defendant has the burden of coming forward with a legitimate, nondiscriminatory explanation for its challenged actions.  The plaintiff must then put forward sufficient evidence for a jury to find that the defendant's proffered nondiscriminatory explanation is pretextual.  *See Elnashar*, 484 F.3d at 1055; *Darke*, 550 F. Supp. 2d at 1042.

-13-

Plaintiffs cannot, however, establish a prima facie case against Lincoln because of the unusual facts of this case, as the Court observed in its March 13, 2006 order. *Mumid*, 2006 WL 640510, at *4 ("In this case, it is not possible for similarly situated people to be treated differently because Plaintiffs allege that all students are members of the same protected class."). To establish a prima facie case of intentional discrimination, a plaintiff must show that (1) he belongs to a protected class; (2) he suffered adverse action; and (3) a similarly situated person (or persons) outside of the protected class — called a "comparator" — did not suffer the challenged adverse action. In this case, with respect to Lincoln, there are no comparators: Lincoln served *only* members of the protected class (foreign-born students); it did not serve any students outside of the protected class.

Given the absence of comparators in this case, the *McDonnell Douglas* framework cannot be applied. Indeed, plaintiffs implicitly acknowledge the inapplicability of the *McDonnell Douglas* framework by choosing not to rely on it in their brief opposing defendants' summary-judgment motion. Instead, they argue that a jury could infer discriminatory intent from the fact that Lincoln provided a substandard education to foreign-born students and no one else. Pl. SJ Opp. at 63-67. For the reasons already explained, the Court finds that no reasonable jury could find, based on the record, that discriminatory animus motivated Lincoln's actions.

2. District 1

Plaintiffs argue, as they do with respect to Lincoln, that a jury could infer discriminatory animus on District 1's part from the fact that Lincoln — under contract to District 1 — provided a substandard education to a population made up entirely of foreign-born students. Pl. SJ Opp. at 67. This argument is no stronger with respect to District 1 than with respect to Lincoln. Thus,

-14-

for the reasons given above, plaintiffs cannot establish District 1's discriminatory intent by the direct method of proof.

District 1, however, differs from Lincoln in that District 1 serves both native-born and foreign-born students.  And plaintiffs have evidence that District 1's policy with respect to testing for special education differed for the two groups of students.  Specifically, District 1 had a general policy of refusing to test foreign-born students for special-education services until they had been enrolled in ELL classes for three years.  Shulman Aff. Ex. A at 9 ¶ 15.  Under the *McDonnell Douglas* framework, this policy supports a prima facie case of discrimination: Plaintiffs are members of a protected class (foreign-born students); that class was subject to adverse action because its members were denied special-education testing until they had taken three years of ELL classes; and non-class members (native-born students) did not suffer the adverse action but rather were offered special-education testing as needed.

District 1 is nonetheless entitled to summary judgment on plaintiffs' discrimination claim with respect to special-education testing for two reasons.  First, eleven of thirteen plaintiffs have no evidence that they personally suffered any injury from District 1's testing policy.  Second, plaintiffs' claim does not satisfy the *McDonnell Douglas* framework because District 1 has offered a legitimate, nondiscriminatory explanation for its policy and plaintiffs have no evidence from which a jury could conclude that the explanation is pretextual.

There is no dispute that District 1 had a general policy of refusing to test foreign-born students for special-education services until the students had taken three years of ELL classes.  But the only students who were injured by policy were those who were in need of testing for special education.  Plaintiffs have offered two types of evidence to support their contention that

-15-

all thirteen of them needed special-education testing, but a reasonable jury could conclude from that evidence that, at most, only two plaintiffs were in need of such testing.

First, plaintiffs point out that one teacher at Lincoln said that four plaintiffs needed special education. Pl. SJ Opp. at 68; Shulman Aff. Ex. TT. But the teacher did not identify the particular plaintiffs he had in mind, and in any event, there is no evidence that the teacher knew what he was talking about — that is, there is no evidence that he was qualified to assess special-education needs generally or that he had enough information about the four (unnamed) plaintiffs to assess their particular needs. Second, plaintiffs point out that two of them — Amal Mohamed and Yurub Siyad — were granted accommodations under § 504 plans. Pl. SJ Opp. at 69. Such plans are developed for students with disabilities, and a reasonable jury could find, based on the existence of those plans, that District 1 should have assessed the needs of these two plaintiffs for special-education services earlier than it did. But a reasonable jury could not find that any of the other eleven plaintiffs was deprived of special-education testing that he or she should have received.

As to the two plaintiffs who may have been harmed, however, there is no evidence that District 1's explanation for its policy of delaying special-education testing is a pretext for discrimination. Accordingly, Amal Mohamed and Yurub Siyad, like the other eleven plaintiffs, cannot prevail on their Title VI claims against District 1.

The evidence shows that District 1 adopted its policy with respect to special-education testing because it did not believe that it could reliably assess whether a student needed special-education services until the student had been in the country long enough to learn English. Shulman Aff. Ex. A at 9 ¶ 15. The wisdom of District 1's policy was doubtful, and the MDE

required District 1 to abandon the policy because it violated state and federal regulations. *Id.* at 11-13. But for *McDonnell Douglas* purposes, the reasons for District 1's policy need not have been *wise*; they need only have been *sincere* (and nondiscriminatory). District 1's explanation is indeed nondiscriminatory, and plaintiffs have offered no evidence that it is pretextual. Plaintiffs have thus failed to create a question of fact as to District 1's discriminatory intent.

## C.  EEOA Claims

Section 1703 of Title 20 of the United States Code, a provision of the EEOA, forbids states to "deny equal educational opportunity to an individual on account of his or her . . . national origin" by engaging in various practices. 20 U.S.C. § 1703. Subsection (a) forbids "deliberate segregation" and subsection (c) forbids assigning students to schools outside their neighborhoods if doing so would increase the degree of segregation in the school system. *Id.* §§ 1703(a), (c). Although Count 4 of plaintiffs' second amended complaint raises segregation- and assignment-based claims under §§ 1703(a) and (c), plaintiffs conceded at oral argument that the evidence does not support either type of claim. Rather, the evidence shows that each plaintiff chose to attend Lincoln; District 1 did not assign them there or otherwise segregate them. The Court therefore grants summary judgment to defendant District 1 on Count 4.[8]

---

[8]Also at oral argument, in response to a question from the Court about why only District 1 was named as a defendant on plaintiffs' EEOA claims, plaintiffs moved to amend their complaint to assert EEOA claims against Lincoln and the Institute. Defendants pointed out, however, that plaintiffs had asserted EEOA claims against the Institute in an earlier version of the complaint and, after defendants moved to dismiss, plaintiffs amended the complaint to remove those claims. Accordingly, for several reasons — because by its terms § 1703 applies only to states; because defendants dropped EEOA claims after plaintiffs moved to dismiss; because defendants did not move to amend until the summary-judgment hearing; because amendment would be futile in light of the Court's ruling on the EEOA claim against District 1 — the court denies plaintiffs' oral motion to amend.

Plaintiffs bring their remaining EEOA claim, in Count 1 of the second amended complaint, under § 1703(f).  Section 1703(f) identifies "the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs" as a prohibited practice under the EEOA.  20 U.S.C. § 1703(f).  Put another way, § 1703(f) imposes an affirmative obligation on state school systems to "take appropriate action to overcome language barriers . . . ."  *Id.*

Whether District 1 took "appropriate action to overcome language barriers" facing students at Lincoln is, on the record before the Court, a disputed question of fact.  Plaintiffs offer expert testimony that Lincoln used an "English immersion" curriculum that was pedagogically unsound in theory and badly implemented in practice.  Inst. Ex. 21.  District 1 responds by criticizing various aspects of plaintiffs' expert report.  Dist. 1 SJ Mem. at 36-42.  The Court recognizes the force of some of District 1's criticisms, but the Court nonetheless finds that plaintiffs' evidence suffices to create a jury question as to the appropriateness of District 1's efforts to overcome plaintiffs' language barriers.

District 1 is, however, entitled to summary judgment for a different reason:  Plaintiffs' injuries, if any, are not redressable by this Court.  Plaintiffs seek both injunctive and monetary relief.  But, as is explained below, monetary relief is not available for violations of the EEOA, and the injunctive relief sought by plaintiffs would do nothing to redress their injuries.  Redressability is an element of standing, which is a prerequisite to this Court's subject-matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Hall v. LHACO, Inc.*, 140 F.3d 1190, 1195-96 (8th Cir. 1998).  This Court therefore lacks subject-matter jurisdiction over plaintiffs' EEOA claims because plaintiffs lacks standing to bring them.

-18-

### 1.  Injunctive Relief

Plaintiffs seek an injunction that would either (1) forbid Lincoln from engaging in any practices found to be unlawful or (2) shut Lincoln down entirely.  Second Am. Compl. at 19-20 ¶¶ D, F [Docket No. 70].  But no plaintiff will ever again be a student at Lincoln.  Five plaintiffs — Maymuna Muktar Osman, Mohamed Amal, Yurub Siyad, Amina Harun, and Mohamud Mohamed — have already graduated.  The remaining eight plaintiffs are now too old to attend Lincoln or any other public high school.

Because no plaintiff will ever again attend Lincoln, any injunctive relief requiring Lincoln to change its practices or shut its doors will have no impact whatsoever on the plaintiffs.  By definition, then, the injunctive relief sought by plaintiffs cannot redress their injuries, and thus plaintiffs do not have standing to seek that injunction.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 106 n.7 (1983) (holding that plaintiff lacked standing to seek an injunction against the Los Angeles police department's choke-hold policy because he could not "credibly allege that he faced a realistic threat from the future application" of the policy); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184-85 (2000) (discussing *Lyons*). Plaintiffs therefore lack standing with respect to their claims for injunctive relief (as they effectively conceded at the summary-judgment hearing).

### 2.  Money Damages

Section 1712 of Title 20 provides that "[i]n formulating a remedy for a denial of equal educational opportunity or a denial of the equal protection of the laws, a court . . . shall seek or impose only such remedies as are essential to correct particular denials of equal educational opportunity or equal protection of the laws."  20 U.S.C. § 1712.  The plain language of this

provision signals that Congress intended to limit the remedies that courts could impose for violations of the EEOA:  Again, courts can impose "*only* such remedies as are *essential* to *correct*" a particular violation of the EEOA.  *Id.* (emphasis added).  But § 1712 provides no explicit guidance as to whether or when money damages can qualify as an "essential" remedy.

Plaintiffs appeal to the general principle that when Congress creates a cause of action (as it has in the EEOA), courts should presume that all remedies are available, including money damages.  Pl. SJ Opp. at 70-71 (quoting *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 66 (1992)).  Because Congress did not forbid the award of money damages under the EEOA, argue plaintiffs, damages must be available in a case like this one, in which an injunction would not redress the plaintiffs' grievances.

Plaintiffs have not, however, cited a single case in which a court awarded money damages for an EEOA violation.  It would be extraordinary if money damages were available under the EEOA, but, in the thirty-four-year history of the statute, no plaintiff had yet managed to be awarded such damages.  Further, it would be extraordinary if Congress had authorized money damages under the EEOA given the potential for such awards to bankrupt school districts.   In the absence of any authority for plaintiffs' position, and in light of the overall statutory scheme of the EEOA, the Court declines to become the first federal district court ever to allow a suit for money damages under the EEOA.[9]

---

[9]It is possible that the equitable remedies of compensatory education or tuition reimbursement might be available under § 1703(f).  In cases under the Individual with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1482, and its predecessor statutes, courts have held that such remedies are available and, even if they involve the payment of money, are equitable in nature.  *Miener v. Missouri*, 800 F.2d 749, 754 (8th Cir. 1986) ("[T]he plaintiff is entitled to recover compensatory educational services if she prevails on her claim that the

(continued...)

Awarding money damages under the EEOA would not only be unprecedented, but it would also be inconsistent with the tenor of the statute's remedy-related provisions. First, § 1712 itself authorizes only remedies that "are *essential* to *correct*" a particular violation of the EEOA. 20 U.S.C. § 1712 (emphasis added). Money damages can *compensate* a person for harm that she has suffered, but compensating for a wrong is different from "correcting" it. The word "correct" in § 1712 suggests that remedies under the EEOA are equitable in nature and are designed to change specific practices that violate the statute rather than to compensate victims. Indeed, commentators seem to assume that § 1712 authorizes only equitable remedies. *See* 6 Fed. Proc., L. Ed. § 11:407 (West 2008) ("The scope of a trial court's equitable powers to remedy past wrongs in school-desegregation cases is broad, for breadth and flexibility are inherent in equitable remedies.").

Further, the EEOA's remedy provisions are directed explicitly at equitable remedies such as busing, not at money damages. Sections 1712 through 1718 of Title 20, enacted as §§ 213 to

---

⁹(...continued)
defendants denied her a free appropriate education in violation of the [Education of the Handicapped Act, a predecessor or the IDEA]."); *S.V. v. Sherwood Sch. Dist.*, 75 F. Supp. 2d 1153, 1157 (D. Or. 1999) ("Compensatory education, like retroactive tuition reimbursement, requires the school district to belatedly pay expenses that it should have paid all along[.] Unlike tuition reimbursement, however, compensatory education is a prospective remedy that allows a disabled student to continue education beyond age 21 in order to make up for the earlier deprivation of a free appropriate public education. Both claims, tuition reimbursement and compensatory education, are equitable remedies similarly intended to secure a disabled student's right to a free appropriate public education.") (quotations omitted), *rev'd on other grounds*, 254 F.3d 877 (9th Cir. 2001).

But plaintiffs have not asked for either compensatory educational services or tuition reimbursement, nor have they briefed the question whether such remedies are available under the EEOA. The theoretical availability of such remedies therefore does not provide a basis for the Court to deny summary judgment.

219 of the EEOA, make up the entire "Remedies" subsection of the EEOA.  *See* Equal

Educational Opportunites Act of 1974, Subpart 4, Pub. L. No. 93-380, 88 Stat. 484, 516-18.

Sections 1713 through 1718 give no hint that money damages are available under the EEOA; to

the contrary, they focus on equitable remedies.

Section 1713, for example, entitled "Priority of remedies," requires courts to give

preference to certain types of equitable remedies (e.g., assigning students to nearby schools, 20

U.S.C. § 1713(a)-(b)) over others (e.g., constructing magnet schools, 20 U.S.C. § 1713(f)).  An

award of money damages is not among the remedies listed in § 1713, which governs

"formulating a remedy for a denial of equal educational opportunity or a denial of the equal

protection of the laws, which may involve directly or indirectly the transportation of

students . . . ."  20 U.S.C. § 1713.

Unfortunately, the reach of § 1713 is not entirely clear, and it likely applies only to certain

remedies — those that "may involve directly or indirectly the transportation of students . . . ."  *Id.*

The reach of § 1713 depends on whether the relative clause "which may involve directly or

indirectly the transportation of students" is a restrictive or nonrestrictive modifier of the noun

"remedy."[10]  That is, does § 1713 govern *only* remedies that "may involve directly or indirectly

_____

[10]A "restrictive relative clause" is a clause that, as the name suggests, limits in an
essential way (i.e., restricts) the reach of what it modifies (i.e., what it is "relative" to).  *See*
Bryan A. Garner, *Garner's Modern American Usage* 782 (2003) (entry on "that").  By contrast, a
"nonrestrictive relative clause" provides nonessential information about what it modifies; it is
basically an aside.  *Id.*

Modern grammarians prefer the terms "integrated" and "nonintegrated" over the
traditional terms "restrictive" and "nonrestrictive," but the difference is mainly terminological,
not substantive.  Rodney Huddleston & Geoffrey K. Pullum, *Cambridge Grammar of the English
Language* ch. 12 § 2.2 at 1034-35 (2002) ("Integrated relatives are so called because they are
(continued...)

the transportation of students," but not other kinds of remedies (i.e., is the phrase beginning

"which may involve" restrictive)?  Or does § 1713 govern *any* remedy under the EEOA, some of

which may happen to involve the transportation of students (i.e., is the phrase beginning "which

may involve" nonrestrictive)?  Section 1713 is *punctuated* as if the phrase "which may involve"

is nonrestrictive — the phrase is preceded by a comma, and this is the conventional way of

marking a "which" clause as nonrestrictive.[11]  But the remedies listed in § 1713 all relate to the

geographic distribution of students and schools, and it therefore makes sense that the listed

remedies would relate only to remedies *that* (restrictive) may involve the transportation of

students.[12]

_____

[10](...continued)
integrated into the construction containing them. . . .  The prototypical integrated relative serves
to restrict the denotation of the head nominal it modifies, and is often referred to by the term
'restrictive relative.'").  One could also use the less formal terms "defining" (for "restrictive" or
"integrated") and "non-defining" (for "nonrestrictive" or "nonintegrated").  *See* Kingsley Amis,
*The King's English* 226 (St. Martin's Griffin 1999).

[11]*See* Garner, *Garner's Modern American Usage* 782; Wilson Follett, *Modern American
Usage* 322 (Jacques Barzun ed., Avenel Books 1980) (entry on "that, which").

[12]Many writers on English usage discourage the use of "which" to introduce restrictive
relative clauses, advocating instead that "which" should be used only to introduce nonrestrictive
relative clauses and that "that" should be used to introduce all restrictive relative clauses.  *See,
e.g.*, Garner, *Garner's Modern American Usage* 782-83; Amis, *The King's English* 225-27;
Follett, *Modern American Usage* 321-25; H.W. Fowler, *Dictionary of Modern English Usage*
625-28 (Ernest Gowers ed., 2d ed. 1965) (entry on "that, rel. pron.").  There is no doubt,
however, that — as a descriptive matter — many of the best writers of English prose often use
"which" to introduce restrictive relative clauses.  *See Webster's Dictionary of English Usage*
894-96 (Merriam-Webster 1989) (entry on "that"); Follett, *Modern American Usage* 321-25.

There is, however, good reason to prefer using "that" rather than "which" to introduce
restrictive relative clauses, as the discussion in the text illustrates:  Sometimes it is unclear
whether a "which" clause is intended to be restrictive or nonrestrictive, particularly when the
clause is preceded by a comma.  *See* Amis, *The King's English* 227 ("Confusions may arise when
the writer becomes nervous of the length of his defining clause and puts in a pair of commas that
(continued...)

Nonetheless, even if § 1713 applies only to remedies that may involve the transportation of students and not to other remedies, the remaining remedy-related provisions of the EEOA focus exclusively on equitable remedies, not money damages.  Section 1714 is entitled "Transportation of students" and governs just that.  20 U.S.C. § 1714.  Section 1715, titled "District lines," specifies the circumstances under which the boundaries of school districts can be disregarded in formulating remedies for EEOA violations.  20 U.S.C. § 1715.  Section 1716 provides that school districts can adopt voluntary desegregation plans.  20 U.S.C. § 1716.  Section 1717 allows parents and school districts to challenge busing orders and desegregation plans if "the time or distance of travel" for a student is excessive.  20 U.S.C. § 1717.  And § 1718 governs the termination of "[a]ny court order requiring, directly or indirectly, the transportation of students for the purpose of remedying a denial of the equal protection of the laws . . . ."  20 U.S.C. § 1718.

As noted above, money damages would not "correct" (but would merely compensate for) a violation of the EEOA, and therefore the plain text of § 1712 does not seem to authorize a remedy of money damages.  This conclusion is reinforced by §§ 1713 through 1718, which — taken with § 1712 — indicate that Congress intended to authorize only equitable remedies under the EEOA.  Because plaintiffs are entitled to neither money damages nor an injunction, the Court holds that plaintiffs lack standing to bring their EEOA claims because their injuries, if any, are not redressable.

---

[12](...continued)
make the clause seem like a non-defining one . . . .").  Because "that" cannot be used to introduce nonrestrictive relative clauses, a "that" clause is always unambiguously restrictive.

### D.  MFAS's Third-Party Complaint

In its third-party complaint, District 1 brings claims of contribution and indemnification against MFAS, seeking recovery from MFAS for any damages District 1 may be ordered to pay plaintiffs.  MFAS moves for partial summary judgment based on contracts that governed the relationship between MFAS and District 1.  Because the Court grants summary judgment to Lincoln and District 1 on all of plaintiffs' claims, MFAS's claims are moot, and the Court therefore denies MFAS's summary-judgment motion.

### ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      The motion of defendants Abraham Lincoln High School and the Institute for New Americans for summary judgment [Docket No. 115] is GRANTED.

2.      The motion of defendant/third-party plaintiff Special School District No. 1 for summary judgment [Docket No. 126] is GRANTED.

3.      The motion of third-party defendant Metropolitan Federation of Alternative Schools for partial summary judgment [Docket No. 110] is DENIED AS MOOT.

4.      Plaintiffs' second amended complaint [Docket No. 70] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  July 16, 2008                                    s/Patrick J. Schiltz
                                                        Patrick J. Schiltz
                                                        United States District Judge